AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia





FILED

SEP – 5 2019

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

In the Matter of the Search of
)
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
)
Case No.   1:19-SW-1201
)
9427 Hensley Road, Manassas, Virginia 20112
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1) | The defendant distributed 28 grams or more of a mixture or substance containing a detectable amount of cocaine base, a schedule II controlled substance. |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

SAUSA Karolina Klyuchnikova

S/A _____
*Applicant's signature*

Stephen L. Smith, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5 Sep 19

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

City and state:  Alexandria, VA



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | **UNDER SEAL** |
| 9427 Hensley Road, Manassas, Virginia 20112 | Case No. 1:19-sw-1201 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Stephen L. Smith, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search premises known as 9427 Hensley Road, Manassas, Virginia, 20112 (hereinafter, "TARGET PREMISES") further described in Attachment A, for the things described in Attachment B.

2.      I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following vehicles should these vehicles be parked in the parking lot or street outside the TARGET PREMISES, when the search warrant is executed: (1) a gray 2007 Mercedes S Class bearing Virginia registration UNM6507[1], VIN: WDDNG71X77A049275 (hereinafter, "SUBJECT VEHICLE 1"); and (2) a white 2007 Dodge Charger bearing Virginia registration 13585T[2], VIN: 2B3KA43R97H738216 (hereinafter,

---

[1] SUBJECT VEHICLE 1 previously had a temporary tag number, but now has the current registration number. The VIN number for the vehicle has remained the same.
[2] SUBJECT VEHICLE 2 previously had a different temporary tag number. The VIN number for the vehicle has remained the same.

"SUBJECT VEHICLE 2").

3.     As explained further herein, DERRICK LAMONT LANE distributed 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), within the Eastern District of Virginia.

4.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since 2014.  Prior to my appointment with the ATF, I was a sworn law enforcement officer with the Commonwealth of Virginia for over four years.  I am currently assigned to the ATF Falls Church Group II Field Office, an enforcement group responsible for investigating violent crime, gangs, armed drug trafficking, and other firearm related violations.

5.     During my time as a law enforcement officer, I have become knowledgeable about the methods and modes of narcotics operations, and the language and patterns of drug use and trafficking.  I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

6.     Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating parties' cellular telephones or other devices.  It is also commonly understood and known that many people in our society communicate with their cellular telephones and other

2

devices in both manners.

7.      Based on my training and experience, I also know that information gained through the obtaining of data stored in the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones.

8.      Based on my training and experience, I also know that distributors of controlled substances will utilize vehicles to move, store, and conceal their controlled substances and proceeds from law enforcement and the theft of others. These vehicles may have "traps" or other concealment methods within the vehicle or attached to the vehicle.

9.      Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

10.      Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when

money was possessed or transferred.

11.     The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

12.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### Background on the Investigation

13.     In July of 2019, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and the Prince William County Police Department ("PWCPD") Narcotics Unit began investigating an armed drug trafficker operating within the Eastern District of Virginia. A confidential informant ("CI-1") reported to ATF and PWCPD that Derrick LANE is an armed narcotics distributor operating within the Eastern District of Virginia.  The information provided by CI-1 about LANE regarding his location, vehicles, and co-conspirators was corroborated by law enforcement and found to be credible.

14.     On September 4, 2019, CI-1 was arrested after narcotics, including cocaine, crack cocaine, marijuana, and methamphetamine were recovered from his/her residence.  However, I believe that CI-1 provided reliable information during the course of this investigation. The information provided by CI-1 was corroborated by law enforcement observation, as well as audio and/or video recordings, as described further below.

15.     LANE is currently on supervised probation for felony distribution of crack cocaine. LANE has been convicted of a crime punishable by imprisonment for more than one year and therefore is prohibited from possessing a firearm.

16.     CI-1 advised law enforcement that he/she has maintained a relationship based on narcotics transactions with LANE for approximately four to five years. CI-1 advised he/she has known LANE for approximately ten years.  LANE knows CI-1 to be from Virginia and sell crack cocaine in Virginia.  CI-1 advised that the most cocaine he/she has obtained from LANE at one time is 28 grams but has seen LANE with as much as 84 grams. CI-1 stated that LANE commonly possesses a firearm during narcotics transactions.

17.     On or about July 2, 2019, Virginia State Police ("VSP") and PWCPD Narcotics Unit conducted a controlled purchase of approximately seven grams of crack cocaine from LANE for $300.00. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. CI-1 spoke to LANE via cellphone regarding the details of the narcotics transaction, including the quantity and price. CI-1 was driven to the TARGET PREMISES by a Virginia State Police undercover officer ("SUC"). CI-1 met with LANE outside the TARGET PREMISES, and LANE and CI-1 went inside the TARGET PREMISES. I am informed by CI-1 that once inside LANE's bedroom, LANE gave CI-1 about seven grams of alleged crack cocaine in exchange for United States currency. Furthermore, CI-1 observed three rifles and one pistol in LANE's bedroom during the controlled purchase.  The transaction was video recorded. The suspected crack cocaine provided by LANE field tested positive for cocaine.

18.     On or about July 11, 2019, PWCPD, ATF, and VSP conducted a controlled purchase of approximately one ounce of crack cocaine from LANE for $1,150.00. CI-1 contacted

LANE via cellphone to arrange the narcotics transaction, including quantity and price. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. Law enforcement provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was audio/video recorded.

19.     On or about July 11, 2019, CI-1 was driven by an Undercover Officer ("UC") to the TARGET PREMISES. While the UC stayed inside of the vehicle, CI-1 entered the TARGET PREMISES. I am informed by CI-1 that he went to LANE's bedroom and observed the same three rifles as on July 2, 2019, in plain view. LANE left CI-1 in the bedroom alone, and went into the bedroom directly across the hallway. CI-1 reported that LANE returned from the bedroom with approximately three ounces of suspected crack cocaine. LANE then counted out eight individually wrapped pieces of the suspected crack cocaine, and placed them into a larger clear plastic bag. LANE gave the crack cocaine to CI-1 in exchange for United States currency. LANE used a money marker (used to determine if currency is fake) on each of the ATF agent cashier bills. CI-1 discussed purchasing firearms from LANE in the future. The suspected crack cocaine provided by LANE field tested positive for cocaine.

20.     On or about July 16, 2019, PWCPD, ATF, and VSP conducted a controlled purchase of approximately 56.3 grams of crack cocaine from LANE for $2,300.00. CI-1 contacted LANE via cellphone to arrange the narcotics transaction, including quantity and price. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

21.     On or about July 16, 2019, CI-1 was driven by a UC to the TARGET PREMISES. Upon arrival, CI-1 contacted LANE via cellphone. CI-1 advised LANE that he was outside and asked LANE to open the door to the TARGET PREMISES. LANE was observed exiting the TARGET PREMISES, and then walking back inside the TARGET PREMISES with CI-1. I am informed by CI-1 that once inside, LANE once again brought CI-1 to LANE's bedroom, and then went into the bedroom across the hall.  LANE returned a short while thereafter with the crack cocaine. LANE gave CI-1 the crack cocaine, in exchange for United States currency. CI-1 informed law enforcement that, once again, all three rifles were present in LANE's bedroom during the controlled purchase. The suspected crack cocaine provided by LANE field tested positive for cocaine.

22.     On or about July 25, 2019, PWCPD, ATF, and VSP conducted a controlled purchase of approximately 57 grams of crack cocaine from LANE for $2,300.00. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was audio/video recorded.

23.     On or about July 25, 2019, CI-1 contacted LANE via cellphone and arranged to purchase two ounces of crack cocaine in exchange for $2,300.00. LANE agreed to meet with CI-1 at Velocity Wings, a restaurant located at 10090 Dumfries Road, Manassas, Virginia 20110. LANE was observed by law enforcement leaving his residence driving SUBJECT VEHICLE 1 and travelling to the agreed upon location. LANE was then observed by law enforcement arriving at the meet location in SUBJECT VEHICLE 1. Shortly thereafter, CI-1 contacted LANE via cellphone and told LANE that he had arrived. CI-1, who had arrived with the UC in the

7

unmarked police vehicle, then met LANE inside of SUBJECT VEHICLE 1. Once inside SUBJECT VEHICLE 1, LANE handed out two ounces of crack cocaine to CI-1 in exchange for United States currency. The suspected crack cocaine field tested positive for cocaine.

24.     On or about August 9, 2019, PWCPD, ATF, and VSP conducted a controlled purchase of approximately 55.5 grams of crack cocaine from LANE for $2,300.00. CI-1 contacted LANE via cellphone to arrange the narcotics transaction, including quantity and price. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

25.     On or about August 9, 2019, CI-1 was driven by a UC to the TARGET PREMISES. Upon arrival, CI-1 contacted LANE via cellphone. CI-1 entered the TARGET PREMISES and immediately went to LANE's bedroom. LANE then weighed the suspected crack cocaine in front of CI-1 and handed CI-1 two ounces of crack cocaine in exchange for United States currency. The suspected crack cocaine field tested positive for cocaine.

26.     On or about August 29, 2019, PWCPD, ATF, and VSP conducted a controlled purchase of approximately 28.5 grams of crack cocaine from LANE for $1,100.00. CI-1 contacted LANE via cellphone to arrange the narcotics transaction, including quantity and price. Prior to the controlled purchase, CI-1 and the vehicle in which CI-1 would travel (an unmarked police vehicle) were searched for any illegal or unauthorized items. No illegal items were recovered. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

27.     On or about August 29, 2019, CI-1 was driven by a UC to the TARGET PREMISES. Upon arrival, LANE was waiting for CI-1 at the front door steps of the TARGET PREMISES. CI-1 entered the TARGET PREMISES with LANE and immediately went to LANE's bedroom. LANE handed CI-1 approximately one ounce of crack cocaine in exchange for United States currency. The suspected crack cocaine field tested positive for cocaine.

28.     On or about February 22, 2019, pursuant to a traffic stop of a vehicle driven by LANE, Culpeper County Sheriff's Office ("CCSO") recovered approximately 104.5 grams of suspected crack cocaine from LANE's person. The crack cocaine field tested positive for cocaine. On August 6, 2019, CCSO released the suspected crack cocaine which was stored at the Virginia Department of Forensic Science to the custody of the ATF. The substance was then sent to the DEA Mid Atlantic Laboratory.

29.     On July 18, 2019, law enforcement installed a surveillance camera in the area of LANE's residence. Since that time, law enforcement observed LANE operate SUBJECT VEHICLE 1 and in the last two weeks; and SUBJECT VEHICLE 2 in the last month. SUBJECT VEHICLE 1 was previously registered to LANE, but is now registered to "Joseph Harris Frye," and SUBJECT VEHICLE 2 is registered to LANE.

30.     The total weight, including packaging, of the suspected crack cocaine purchased on July 2, July 11, July 16, July 25, August 9, and August 29 and the February 22, 2019, and the weight of crack cocaine recovered pursuant to the traffic stop, totaled 339.7 grams. The crack cocaine has been submitted to the Drug Enforcement Administration (DEA) Mid Atlantic Laboratory in Largo, Maryland, for further analysis.

**USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS**

31.     Based on my training, experience, and participation in narcotic and drug-related

9

investigations, and my knowledge of this case, I know that:

    a.  It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

    b.  Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

    c.  Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations. It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

    d.  Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

32.    In my training and experience, it is likely that the PREMISES will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above. Further, I know that LANE has used cellular phones to communicate about drug transactions as described by CI-1, and corroborated by the UC who observed CI-1 contact LANE via cellphone during numerous controlled buys, as

described further above.

33.     I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

34.     If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.  This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

35.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked, and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful

11

attempts to unlock the device via Touch ID are made.

36.     The passcode or password that would unlock the cellular phone is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant cellular phone device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

37.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the TARGET PREMISES to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the TARGET PREMISES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

38.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or

index fingers. In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

39.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the TARGET PREMISES to the Touch ID sensor of cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

40.     After any cellular phones are seized, law enforcement will attempt to search them. If law enforcement cannot complete the search, then agents will send the phones to government laboratory or a private company that specializes in data extraction from electronics.

## TECHNICAL TERMS

41.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.  *Internet*: The Internet is a global network of computers and other electronic

13

devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. *Storage medium*: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

42. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43. *Probable cause.* I submit that if a computer or storage medium is found on the TARGET PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file

14

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

44.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the

15

TARGET PREMISES because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the

16

computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant

17

insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

45. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware

19

and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

46. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

47. *Because* several people share the PREMISES, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

48. Based on the foregoing facts, there is probable cause to believe that DERRICK LAMONT LANE distributed more than 28 grams of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21,

United States Code, Section 841(a)(1).  In addition, there is probable cause to believe that items

and records that are evidence of these violations are currently contained in the PREMISES.  I

submit that this affidavit therefore supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Stephen L. Smith
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me on September ⎯5⎯, 2019.

/s/

Ivan D. Davis
United States Magistrate Judge

21